IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| CONTINENTAL RESOURCES, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> SCOTT DE LA VEGA, ) <br> in his official capacity as Acting Secretary of ) <br> the United States Department of the Interior, ) <br> ) <br> and ) <br> ) <br> THE UNITED STATES DEPARTMENT ) <br> OF THE INTERIOR, ) <br> ) <br> Defendants. ) <br> ) | Civil Action No. _____ |

## VERIFIED COMPLAINT

Continental Resources, Inc. ("Continental") submits respectfully this verified complaint seeking review of agency action under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"). Continental will seek emergency interim relief on an expedited schedule.

1. Continental is a crude oil and natural gas exploration and production company.

2. Continental operates oil and gas leases throughout western North Dakota.

3. This action pertains to fifty Applications for Permit to Drill ("APDs") that Continental submitted in 2020 for wells on lands under the jurisdiction of Bureau of Land Management ("BLM") North Dakota Field Office in Dickinson. For these fifty APDs, BLM's responses were delayed by repeated software errors in BLM's Automated Fluid Minerals Support System 2 ("AFMSS 2"). But for those errors, BLM would have approved these fifty

APDs before January 20, 2021.  Even with the errors, BLM would have approved the fifty APDs by now, but for Secretarial Order 3395, *see* Attachment 1, withdrawing BLM's delegation of authority to approve them and reserving that authority to appointees of the new Administration.

4.	The fifty APDs at issue are in five federal oil and gas units in Williams, Dunn, and McKenzie counties.  The units are named the Charolais South, the Harms, the LCU Foster, the Flint Chips, and the Clear Creek units.  For one of these five units, the Charolais South Unit, which pertains to thirteen APDs, Continental seeks emergency relief.

5.	For the Charolais South unit, the United States Forest Service ("USFS") has indicated it wishes Continental to complete the construction of the well pads, road, and utility corridors before June 10, 2021, to minimize disturbance of wildlife, including the endangered Dakota skipper butterfly. To meet the agency's objective, Continental needs the BLM to issue the thirteen APDs for the Charolais South unit by March 8, 2021.  Continental has twice written senior officials at the Department of the Interior (the "Department"), first the Acting Secretary on February 10, 2021, and second the Acting Assistant Secretary – Land and Minerals Management on February 16, 2021, both letters sent by electronic mail and received the same day they were dated.  These officials have not responded.

6.	Continental requests the Court order BLM to act on all fifty APDs, but specifically seeks emergency relief for an order requiring immediate action on the thirteen APDs pertaining to the Charolais South unit.

*Background*

7. The Mineral Leasing Act, 30 U.S.C. §§ 181-287, establishes mandatory procedures and deadlines the Department must follow when reviewing APDs. The Department has failed to process any of the fifty APDs in the time required by the Act.

8. The permits would have been approved by now in the normal course of business. However, on January 20, 2021, Defendant Acting Secretary of the Interior de la Vega signed Secretarial Order 3395. *See* Attachment 1.

9. Secretarial Order 3395 suspended the authority of the BLM to, among other things, "issue any . . . permit to drill." Attachment 1, § 3g. The Order reserved the power to approve to the top nine Presidentially appointed officials in the Department. *Id*. § 4.

10. On February 10, 2021, Continental wrote the Acting Secretary, bringing to his attention that he was required by law to address the fifty permits. The letter spelled out the delays and the failings of the AFMSS 2. Because BLM was already beyond the time mandated by statute for action, Continental requested the Acting Secretary's prompt action. Attachment 2.

11. On February 12, 2021, Continental learned that the thirteen permits for the Charolais South Unit had been proposed for approval under Secretarial Order 3395 and sent to the Acting Secretary for action. The Acting Secretary then forwarded the permits to Laura Daniel Davis, the Acting Assistant Secretary – Land and Minerals Management, for action. Acting Assistant Secretary Davis is one of the nine officials identified in Secretarial Order 3395.

12. On February 16, 2021, Continental submitted a second letter, this time to Acting Assistant Secretary Davis, emphasizing the time-sensitivity of the Charolais South permits and requesting her immediate approval. Attachment 3.

13. One week later, as of the filing of this verified complaint, the Department has not responded with respect to the Charolais South unit or to the other four units.

## PARTIES

14. Plaintiff Continental is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma.

15. Defendant Scott de la Vega is the Acting Secretary of the United States Department of the Interior. Acting Secretary Vega is the head of the United States Department of the Interior. 43 U.S.C. § 1451.

16. Defendant United States Department of the Interior is an executive department of the government of the United States of America. 43 U.S.C. § 1451.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1361. The United States has waived its sovereign immunity under the APA, 5 U.S.C. § 702.

18. Venue in this Court is proper under 28 U.S.C. § 1391(e)(1)(B) because a substantial portion of the events forming the basis of this action occurred within the State of North Dakota and because the property that is the subject of the action is situated there.

## FACTUAL ALLEGATIONS

*BLM's Administration of Oil and Gas Programs*

19. The United States owns approximately 700 million subsurface acres of mineral estate. The Mineral Leasing Act establishes the framework under which the Secretary of the Interior leases and manages the development of these resources. The Secretary has delegated his

statutory responsibilities associated with the administration of the oil and gas leasing program to the BLM.

20. Within the BLM, the Montana/Dakotas State Office administers the development of oil and gas on federal lands within the State of North Dakota. The North Dakota Field Office in Dickinson, Stark County, North Dakota is a subcomponent of the Montana/Dakotas State Office. For the Charolais South and Harms units, the USFS administers the surface estate. For the Clear Creek, Flint Chips, and LCU Foster units, the surface estate is privately owned.

*Master Development Plans and Unit Plans of Development*

21. BLM is generally responsible for approving a project proponent's APDs, whether the federal government owns both the surface and the minerals or the minerals alone. Where the surface is privately owned, BLM considers surface impacts under both the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA"). Where the surface is federally owned, BLM also reviews the APDs for consistency with BLM-approved Resource Management Plans or Forest Service Land and Resource Management Plans. The environmental review includes an onsite inspection of the proposed well, access road, and pipeline locations, as well as other areas of proposed surface use.

22. For federally owned surface, rather than undergoing environmental review on each individual APD, proponents of oil and gas development have the option of submitting a Master Development Plan to facilitate development on parcels under lease. A Master Development Plan provides information common to multiple planned wells, including drilling plans, Surface Use Plans of Operations ("SUPOs"), and plans for future production. Master Development Plans also include information on associated facilities (e.g., roads, pipelines, utility

corridors, and compressor stations). The Master Development Plan allows federal agencies to conduct NEPA and other reviews on all the proposed activities at one time, rather than performing well-by-well analyses when the APDs are submitted. For the Charolais South and Harms units, on USFS lands, Continental prepared and joined in (with another operator) the Antelope Master Development Plan. BLM's internal guidance documents encourage the use of Master Development Plans to more effectively manage federal lease development. *See* Bureau of Land Mgmt., Instruction Mem. ("I.M.") No. 2005-247 (Sept. 30, 2005) ("An EA or EIS prepared for development of two or more oil, gas, or geothermal wells provides substantial time savings over writing individual EAs or EISs for each well approval and generally results in improved impact analysis.").

23. Work on the Antelope Master Development Plan began in 2012. During its preparation, the federal agencies undertook "formal" consultation with the United States Fish and Wildlife Service under the ESA. That consultation identified the Dakota skipper butterfly as at risk, and the Fish and Wildlife Service issued an "incidental take" permit prescribing limitations on Continental's activities to avoid unnecessary risk to that species.

24. By April 2018, the agencies had completed an environmental assessment under NEPA and determined that approval of the Antelope Master Development Plan was unlikely to have a significant effect on the environment, a finding reflected in a "Finding of No Significant Impact" ("FONSI"). No administrative protest or judicial challenge was filed with respect to the FONSI.

*The Charolais South Unit APDs*

25. The Charolais South APDs will be drilled from two multi-well drilling pads, the A and the B. *See* Attachment 4 (map). To the east lies another Continental multi-well pad, the Brangus. Continental has received all needed permits for operations at the Brangus. An access road north from a county road has been laid, as has its eastern fork to the Brangus pad. The Brangus pad is being constructed. Conductor casing, the initial pipe that protects the near-surface section of the wellbore, is being set for the Brangus wells with the goal of having construction complete in advance of the Dakota skipper work stoppage period of June 10 through July 25.

26. From the point where the access road forks, the access road to the A and B pads, the pads themselves, and authorizations for pipelines and electric cable await approval from Acting Assistant Secretary Davis.

27. Ordinarily, the presence of a sharp-tailed grouse lek within the area would cause the USFS to restrict an operator's activities during the period March 1 through June 15. Here, however, USFS wildlife staff concluded Continental needed to take all steps to complete construction quickly. More specifically, USFS concluded "due to the significant scope of the proposed project, allowing construction to proceed during these dates (March 1 through June 15) for two (2) years from when construction commences and within four (4) years from when the permit is issued *would greatly reduce impacts* to Sharp-tailed grouse and other wildlife species ... using the project area." Attachment 5 (COA at 3 ¶ 15) (emphasis added).

28. Construction has commenced. The first year of the two-year waiver for spring construction is in place. The Department's delay is, in the judgment of the USFS, adding to the risk of impacts to wildlife in the area.

29. Further USFS requirements add to the risk of delay to Continental. Continental may not begin drilling its Charolais wells until it has first constructed "all oil pipelines, gas pipelines, saltwater pipelines and flowlines paralleling the access roads." *Id*. at 2, ¶ 11. Authorizations for these lines are held up on the Acting Assistant Secretary's desk. As a result, Continental cannot undertake construction of the access road north of the fork

30. Along the routes for the access roads to Charolais pads A and B, lack of approval of the APDs has made it impractical even to set up the protective fencing needed for the Dakota skipper during construction.

31. The list of tasks to be completed before June 10 is lengthy. In more or less the following order, and simultaneously where possible, Continental must: (1) install the habitat fencing; (2) construct the pad for the Central Tank Battery (shown on Attachment 4 as the "CTB") to receive production from the three well pads; (3) deliver pipe to the CTB for staging to be used when the various lines are laid; (4) complete the Brangus road and well pad; (5) allow access to Continental's third-party vendor to lay the flow lines required to transport production of emulsified oil, gas, and water from the Brangus pad to the CTB; (6) build the road and the B pad for the nine Charolais South wells 7 through 15; (7) provide access to the midstream companies Bridger Pipeline, LLC, Oneok, Inc., and Goodnight Midstream Bakken, LLC, to install the equipment to move oil, gas, and produced water away from the project; (8) build the access road and the A pad for the four Charolais South wells 3 through 6; and (9) allow access to

Continental's third-party vendor to lay the flow lines from the Charolais South A and B pads to the CTB facility.

32. The goal is to complete the construction phase before the June 10 halt for the Dakota skipper. Drilling and completion activities would be scheduled to commence after July 25.

33. In addition to the risk the Department's delay poses to wildlife, Continental itself faces unrecoverable economic losses from a delay that prevents completion of construction this spring.

34. As is customary in the oil and gas business, Continental has to pay certain of its vendors a "mobilization fee" to compensate the vendor for costs of staging equipment and crew to be available on site when scheduled. Delay and uncertainty related to federal permitting has caused a halt to the work and required contractors to leave the project prematurely, only to return at a later date when permits are in hand. This delay will lead to Continental paying mobilization fees twice, a loss that can be estimated to be between $20,000 to $150,000, depending on the duration of the continued delay.

35. Further delay will postpone production. That postponement delays Continental's receipt of revenue from the thirteen Charolais South wells. Stated differently, further delay causes an immediate decrease in the net present value of these wells.

36. If these delays continue and these several losses are incurred, Continental has no legal means to recover them.

*Continental's Permit Applications for the Remaining Wells*

37.     For the Harms unit, Continental's activities have been reviewed and approved under the Antelope Master Development Plan.  BLM and USFS have authorized the surface disturbance needed to construct a road, construct a well pad, and to drill two wells.  The Forest Service has also approved the SUPO—the surface use plan—for the remaining eleven wells.  All that remains to be done is for the Acting Assistant Secretary to approve the eleven APDs.

38.     For the Clear Creek unit, BLM has received the required cultural resource surveys.  Continental has obtained the required permit from the United States Army Corps of Engineers in connection with the access road to be built.  BLM has agreed that the Dakota skipper's habitat will not be affected by the drilling operations.  The environmental assessment has been completed.  All that remains is for the Acting Assistant Secretary to sign the APDs.

39.     For the LCU Foster unit, all required reviews have been completed.  All that remains is for the Acting Assistant Secretary to sign the APDs.

40.     For the Flint Chips unit, BLM failed to act for sixty-nine days because of a software error in its electronic permitting system.  *See* Attachment 1 at p. 2.  BLM received the APDs on November 12, 2020.  It acknowledged the APDs were complete.  All that remains is for the Acting Assistant Secretary is complete the BLM's long overdue action.

*Impact on Development*

41.     BLM's illegal delay in processing these fifty APDs has injured and will continue to injure Continental. Further delay will postpone production.  That postponement delays Continental's receipt of revenue from the thirteen Charolais South wells.  Further delay causes an immediate decrease in the net present value of all fifty of these wells.

42. Continental's project timetable has been premised on, among other factors: (i) the assumption that BLM would fulfill its statutory obligations under 30 U.S.C. § 226(p) and other applicable law when processing Continental's APDs; (ii) BLM's timely processing of APDs for wells in the five units; (iii) Continental's knowledge that environmental review for the APDs had already been conducted as part of the Antelope Master Development Plan and related BLM planning for development of the severed federal mineral estate in three of the units; and (iv) BLM's own goal that the permits would be granted in a manner that would allow Continental to comply with the applicable conditions of approval.

43. BLM has denied Continental's procedural right to have the APDs Continental submitted processed in accordance with the mandatory procedures, and within the obligatory deadlines, that the Mineral Leasing Act establishes. *See Spokeo v. Robins*, 136 S. Ct. 1540, 1549 (2016) (explaining that "the violation of a procedural right granted by statute" can constitute the injury in fact required for a plaintiff to establish standing).

## COUNT I

### BLM'S ACTION IS CONTRARY TO LAW
### (5 U.S.C. § 706)

44. Continental reasserts and incorporates by reference the preceding paragraphs as if fully set forth herein.

45. The Mineral Leasing Act requires that: "Not later than 10 days after the date on which the Secretary receives an application for any permit to drill, the Secretary shall-- (A) notify the applicant that the application is complete; or (B) notify the applicant that information is missing and specify any information that is required to be submitted for the application to be complete." 30 U.S.C. § 226(p)(1)(A)-(B).

46. The Mineral Leasing Act requires that:

> "Not later than 30 days after the applicant for a permit has submitted a complete application, the Secretary shall—
>
> (A) issue the permit, if the requirements under the National Environmental Policy Act of 1969 and other applicable law have been completed within such timeframe; or
>
> (B) defer the decision on the permit and provide to the applicant a notice—
>
> (i) that specifies any steps that the applicant could take for the permit to be issued; and
>
> (ii) a list of actions that need to be taken by the agency to complete compliance with applicable law together with timelines and deadlines for completing such actions."

30 U.S.C. § 226(p)(2)(A)-(B).

47. The Department has never identified any new information bearing on environmental impacts requiring additional NEPA analysis for any of the fifty APDs Continental submitted. The Department was statutorily required to issue the APDs under 30 U.S.C. § 226(p)(2)(A), or provide a reasoned deferral under 30 U.S.C. § 226(p)(2)(B), long before the filing of this verified complaint.

48. The Department has never given Continental any notice containing the information that 30 U.S.C. § 226(p)(2)(B) requires it to provide an applicant when it chooses to defer issuing a decision on an APD.

49. The Department has failed to meet its non-discretionary, mandatory obligations under 30 U.S.C. § 226(p).

## **PRAYER FOR RELIEF**

Continental requests respectfully that the Court grant the following relief:

1. Direct the Department to immediately issue all thirteen APDs for the Charolais South wells or provide a non-arbitrary reason to withhold approval under 30 U.S.C. § 226(p)(2)(B) by no later than March 8, 2021;

2. With respect to the remaining wells, direct the Department to issue the APDs or notices compliant with 30 U.S.C. § 226(p)(2)(B) within seven days of the Court's order;

3. All costs and attorneys' fees authorized under 28 U.S.C. § 2412; and

4. Such other and further relief, in law and in equity, to which Continental may be entitled.

Submitted respectfully this 23rd day of February, 2021,

> By: */s/ L. Poe Leggette*
> L. Poe Leggette
> Alexander K. Obrecht, ND Bar # 08346
> BAKER & HOSTETLER LLP
> 1801 California Street, Suite 4400
> Denver, Colorado 80202-2662
> Telephone: (303) 861-0600
> pleggette@bakerlaw.com
> aobrecht@bakerlaw.com
>
> *Counsel for Plaintiff Continental Resources, Inc.*

## **VERIFICATION**

On behalf of Continental, I have reviewed this Verified Complaint. I know or believe that all allegations in the Complaint of which I have personal knowledge are true. I believe that the allegations of which I do not have personal knowledge are true based on documents and other information I have reviewed. I verify under penalty of perjury that the foregoing is true and correct.

Date: February 22, 2021

/s/  Chad B. Newby

 Chad B. Newby, Director, Project Management
for Continental Resources, Inc.

\* Counsel and Mr. Newby certify they have the signed original of this verification which is available for production to the Court or inspection during normal business hours by a party to this action.

4841-8100-8093.1